# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **PATRICIA KATZ**<br>     **Plaintiff**<br><br>**V.**<br><br>**SPINEFRONTIER, INC.**<br>     **Defendant** | Case No. 15-cv-11730 |

## COMPLAINT

## PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS

Plaintiff Patricia Katz ("Katz") hereby files this complaint against SpineFrontier, Inc. ("SpineFrontier"), and states as follows:

## INTRODUCTION

1.      This case involves a company's manufacture and sale of dangerous, misbranded medical devices and its unlawful termination of an employee for her efforts to stop her company from continuing to produce devices that were out of compliance with federal regulations.  Under those and other regulations designed to protect public safety, the devices were both misbranded and adulterated and unfit to be sold in the United States.

2.      Soon after her employment began, Katz voiced concern about SpineFrontier's lot tracking and tracing procedures, which involved little to no tracking. She discussed it with her immediate supervisor, who told her that such tracking and tracing was not essential.  When a grant from the Commonwealth of Massachusetts made it possible for SpineFrontier to offer compliance classes to its employees, Katz

enrolled in two of them in order to become qualified as a compliance auditor.  In the first, she learned that SpineFrontier's lot tracking and tracing procedures violated federal safety regulations for medical devices.  In the second, she learned how to act on that information: by opening a Corrective and Preventative Action ("CAPA").  But when Katz opened a CAPA for SpineFrontier's lot recording deficiencies, the company's Chief Innovation Officer promptly closed it.

3.     Katz contacted the Food & Drug Administration for help understanding whether lot tracking and tracing was a requirement for medical devices like those manufactured by SpineFrontier, doing so without identifying the company.  When she received confirmation that what she had learned in compliance training was correct and that what she had been told by SpineFrontier officials was wrong, she forwarded her correspondence with a Food & Drug Administration ("FDA") agent to three company officials.  A meeting was scheduled for a day while Katz was away from the office, and in the morning of her very next work day after that meeting, Katz was terminated on pretexts in direct conflict with her company performance reviews.

4.     Unbeknownst to Katz, SpineFrontier had little interest in lot tracking or tracing because it did little with that information anyway.  Soon after her termination, Katz contacted the FDA by phone to report the violations, later following up with a letter.  When the FDA investigated, it found rampant problems with tracking, tracing, design and inspection safeguards, and handling of adverse event investigation and

reporting, leading to a formal, public warning letter that designated the company's devices as adulterated and misbranded for nine types of violations.

5.     SpineFrontier knew that its devices were misbranded and adulterated, but marketed and sold them anyway despite the prohibitions of federal law.  This was a violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, that Katz attempted to stop. When it became clear to SpineFrontier that Katz would not let the matter drop and that she was willing to speak with the FDA about it, she was immediately terminated.  This conduct was retaliation that is prohibited by the False Claims Act, 31 U.S.C. § 3730(h), and the Massachusetts False Claims Act, 12 M.G.L. § 5J, and also constituted a termination in violation of public policy under the Massachusetts common law.

## PARTIES

6.     Plaintiff Patricia Katz is an individual with a principal residence in Arlington, MA.  Katz was 47 years old at the time her employment was terminated.

7.     Defendant SpineFrontier, Inc., is a Massachusetts based medical device company that was founded in 2006.  SpineFrontier designs, develops, and markets implants and instruments used in the treatment of spinal diseases.  SpineFrontier's principal place of business is located at 500 Cummings Center, Suite #3500, Beverly, MA 01915.  SpineFrontier is a privately held company and has approximately fifty employees.

## JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*  In addition, the FCA specifically confers jurisdiction upon the United States District Court.  31 U.S.C. § 3730(h)(2).  This Court has supplemental and diversity jurisdiction over Katz's state law claims.

9.      This District Court has personal jurisdiction over SpineFrontier pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and SpineFrontier has sufficient minimum contacts with the United States of America.

10.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because SpineFrontier transacts business in this judicial district.

## FACTUAL ALLEGATIONS

11.     On February 11, 2011, Katz was hired as Senior Accountant for SpineFrontier, in large part because of her track record of successful work in a similar role with other young companies.  As Senior Accountant, Katz was responsible for the company's financial statements and transaction details.  Katz was also tasked with the responsibility of ensuring the accuracy of usage forms that were used to record sales and invoice hospitals.

4

12.     When reviewing usage forms, Katz immediately noticed that the lot numbers associated with SpineFrontier's medical devices were rarely, if ever, recorded. Katz was alarmed by this practice and, in April 2011, brought it to the attention of Aditya Humad – SpineFrontier's Chief Financial Officer and Vice President of Business Development.  Katz was told by Humad and other company executives that SpineFrontier was aware of its failure to record lot numbers but that it was not an essential requirement.  Katz was told that, from a practical standpoint, it was too cumbersome for a SpineFrontier representative present during a surgery to have to log the lot numbers of SpineFrontier's medical devices.  Katz was uncomfortable with what she was told, but did not then have the requisite compliance expertise to do anything but trust that the information she was receiving from the company's executives was accurate.

13.     Throughout 2011, Katz's hard work and dedication was recognized by her superiors in two performance reviews and with discretionary bonuses.  On July 18, 2011, Aditya Humad completed Katz's Performance Evaluation form for her first five months of work.  The Performance Evaluation reflected favorably on Katz's job performance.  In the Evaluation, Humad noted that Katz exceeded expectations regarding job knowledge and productivity, and wrote that Katz "knows what needs to be done, has good understanding of accounting procedures, adjustments, [and] HR process."  Overall, Katz met or exceeded performance expectations in ten out of twelve categories.  In no category was Katz scored a "1" out of SpineFrontier's 1-5 scale.  Katz

was given a "2" in the communication category, with notes to improve email response and be receptive to the suggestions or thoughts of other team members.  Katz was also given a "2" for another, highly related category: "cooperation and teamwork."  The comment for the latter was prescient: it coached Katz "to find best solution for Company not just Accounting" (emphasis in original).  The completed review was preceded on July 7, 2011 by a discretionary mid-year bonus of $500 in cash and $5,000 in restricted stock units.

14.     On December 14, 2011, less than three months before Katz's wrongful termination, her Employee Year-End Performance Evaluation was completed by Aditya Humad.  The Evaluation was noticeably stronger in almost every respect compared to her July Performance Evaluation.  Humad rated Katz's job performance "above average" in 24 out of 26 possible categories.  In 16 of the 26 categories, Katz's job performance was rated "great" or "excellent."  Humad noted that commitment and dedication to the job were some of Plaintiff's strengths.

15.     Plaintiff's performance was described as "average" with respect to two of the 26 categories.  One was "multi-tasking," under the "Job Performance" heading.  In comments, Humad encouraged Katz to ask questions in order to better multi-task; he also noted that the previous year's audit was a "mess from previous employees," something that had complicated Katz's then-recent efforts to complete that current year's audit.

6

16.     In the new review format, "Communication and Interpersonal Skills" had become a heading rather than a specific category, now with 14 of the total 26 categories. Although all 14 of the "Communication and Interpersonal Skills" categories seemed to be a more granular account of the only two categories for which Katz had been rated merely average five months prior, Katz was rated well in nearly all; in fact, it was only the "creative writing" category in which Katz was rated merely average. "Creative writing" was defined by the review as the "Ability to influence readers through creative writing resulting in a change in perception of value, urgency, quality, or other abstract qualities." Humad nonetheless noted in the comments that Katz's recommendations on how to put an end to the "mess" from the previous year's audit would be "going forward" for the following year.

17.     The next day, Katz was rewarded with a discretionary year-end performance bonus: $1,000 as an after-tax cash bonus and $10,000 worth of restricted stock units. The letter describing the bonus contained a handwritten note from Humad: "Great job in pushing through audit and managing IMIS. Have a lot ahead of us in systems and processes to implement, look forward to some exciting changes for 2012." As 2011 concluded, the feedback Katz had received from SpineFrontier was almost exclusively positive. The main takeaways from the December 2011 review – that Katz ask questions, and that she do better to "influence" change in perception of value, urgency and quality through writing – were soon put to the test less than three months

later, when Katz was faced with convincing SpineFrontier officials of the importance of compliance with medical device regulations concerning patient safety.

18.     In January 2012, SpineFrontier's compliance department offered employees a class sponsored by the International Organization for Standardization ("ISO"), an independent, non-governmental membership organization and the world's largest developer of international standards.  ISO 13285:2003 specifies requirements for a quality management system where an organization needs to demonstrate its ability to provide medical devices and related services that consistently meet customer and regulatory requirements.  The training program was made possible through a grant from the Commonwealth of Massachusetts.

19.     Katz enrolled in the ISO 13285:2003 class to become one of SpineFrontier's auditors.  Katz completed the sixteen hour class over the course of three days in January, 2012, and received certification as an auditor.  The ISO 13285:2003 class that Katz completed discussed the federal regulations that required manufacturers of certain implantable medical devices to track and trace medical devices.  Katz learned of the serious public health consequences that could result from a manufacturer failing to adequately record lot numbers associated with medical devices.  Upon completing the ISO class, Katz again told company executives that SpineFrontier was not in compliance with regulations concerning the recording of medical device lot numbers.  Katz was ignored.

8

20.     In February, 2012, Katz also completed a twelve hour CAPA workshop that was offered to SpineFrontier employees.  The purpose of the workshop was to help SpineFrontier maintain and improve its compliance with ISO 13285:2003.  In connection with the CAPA workshop, Katz researched SpineFrontier's history of recording medical device lot numbers and learned that SpineFrontier's pattern of failing to record lot numbers of medical devices dated back to the company's inception in 2006.  Upon learning this information, Katz opened a CAPA on SpineFrontier's failure to record lot numbers with the hope that the company would change its practices and comply with federal regulations.

21.     SpineFrontier's CIO, Christopher Chang, wrote Katz an email regarding the CAPA she had opened.  In his email, Chang told Katz that the CAPA was mere class work, and that the company was going to shut down the CAPA relating to SpineFrontier's deficiencies in recording lot numbers.

22.     Confronted with conflicting information about the necessity of recording of lot numbers, Katz sent an email to the FDA to determine whether or not SpineFrontier was in fact required to record lot numbers.  In the February 28, 2012 email, which Katz sent from her home email address, she stated that she was doing a project on implantable medical devices, and inquired if the FDA's guidelines required each medical device of that type to be tracked and traced to individual patients.  Katz's email did not identify SpineFrontier by name or identify any specific medical devices manufactured by SpineFrontier.

23.     On March 1, 2012, Robert O'Brien of the FDA's Consumer Safety Office responded to Katz's email and informed her that FDA regulations do require all implantable medical devices to be tracked and traced to each patient.  Mr. O'Brien included citations to specific federal regulations in his email, which detailed the requirements for medical device manufacturers.  Included among the materials referenced by Mr. O'Brien was the requirement that medical device lot numbers be recorded by the manufacturer.

24.     Armed with a strong indication that her concerns were more serious than class work, Katz forwarded the email in an effort to change the perception of SpineFrontier officers that addressing the company's non-compliance was an urgent matter.  Katz forwarded her email to O'Brien and O'Brien's response to Alyce Nelson, Director of SpineFrontier's Quality Assurance and Regulatory Compliance Department. She also forwarded the email to executives Christopher Chang and Aditya Humad.

25.     On March 2, 2012, Katz was informed that company executives would hold a meeting on Monday, March 5, 2012, regarding the e-mail she had sent to the FDA.  Katz reminded Humad and Chang that she was traveling to Florida on March 3rd to be with her ailing father and she would not be present for the meeting.  Katz was told that the meeting regarding her email would be held on March 5, regardless of whether or not she was present.

26.     Katz returned to work on the morning of March 12, 2012, and, at the start of the day, was asked to meet with Christopher Chang and Aditya Humad regarding

some HR issues.  At the outset of the meeting, Chang gave Katz a one page letter

informing her that her employment was terminated "effective immediately."  The

termination letter discussed several "areas of concern" that led SpineFrontier to

terminate Katz's employment.

27.     The "areas of concern" were pretextual.  One concerned the handling of

confidential HR information, including a third-hand account of Katz discussing another

employee's employment review – to which the company gave Katz no opportunity to

respond, despite her insistence that no such conversation had occurred.  The allegation

that other employees had conveyed a lack of trust in disclosing confidential information

likewise rang hollow, with the letter concurrently stating that the company did "not

tolerate" mistrust, and yet such issues had never even been discussed with Katz.

Indeed, her most recent review had indicated that Humad thought Katz was "excellent"

and needed "no guidance" in terms of having the respect of others at the company.

28.     The letter also flagged "Interaction" as a problem for Katz, alleging that

she had had "conflict with few employees and external members and vendors."  If true,

any "conflict" would likely have come as a surprise to Humad, who less than three

months earlier had flagged only "average" skill in influencing readers with her writing

and otherwise had given Katz above-average reviews for 13 other communication and

interpersonal skills – including exemplary "needs no guidance" marks for her

"interaction with coworkers," "interaction with clients," "ability to listen to and

11

understand others," and "responding to conflict."  The letter also cited as cause for termination "a very adamant opinion," which was much closer to the truth.

29.    The other cause identified by the termination letter was a vague reference to "performance," that what was identified in reviews as "what needs to be done" had led to slow results.  The only recommendations made in Katz's final review, however, were that Katz work on ways to improve staying on top of emails, on memory, and on attention to detail.  In the short span between the review and the termination letter, Katz had indeed worked on attention to detail while not in compliance classes or in Florida.  The termination letter instead cited Katz for a "lesser focus on execution."  This concern, too, was pretextual.  None of the concerns articulated in the termination letter were present in either of Katz's performance reviews, but are conflicted by them.

30.    Following the meeting, Katz was not allowed to return to her desk. Instead, she was asked to wait in the reception area, and then was escorted out of the building. The termination letter and the manner in which she was terminated were intended to intimidate her, and had the desired effect.  The long-lasting distress that this caused was severe both emotionally and physically.

31.    In April 2012, Katz spoke with an FDA representative regarding SpineFrontier's failure to adequately record medical device lot numbers.  Katz voluntarily reported the SpineFrontier violations to the FDA because she wanted the company to comply with federal regulations to ensure the safety of patients treated

with SpineFrontier implantable devices.  Katz was told to summarize SpineFrontier's regulatory failures in a letter to the FDA.

32.     On June 18, 2012, Katz wrote a letter reporting SpineFrontier's failure to record lot numbers for implantable medical devices to the FDA's Office of Compliance, citing tracking and tracing regulations in 21 CFR 800-1299, specifically 21 CFR 820.65 and 21 CFR 820.198.

33.     On July 11, 2012, an FDA investigator completed an inspection of SpineFrontier.  As the FDA later stated in a public Warning Letter, that inspection "revealed that [SpineFrontier] devices are adulterated."  The investigator's findings were identified to SpineFrontier with a Form FDA 483.

34.     Christopher Chang and Alyce Nelson responded to the Form FDA 483 on July 15, 2012 and July 23, 2012 in order to address the investigator's findings.  Chang and Nelson indicated that, as part of their effort to address the investigator's findings, they would perform a retrospective review of all closed CAPAs since 2011 – a time frame that would include the CAPA opened by Katz and summarily closed by Chang. The FDA concluded that these responses did not adequately address the investigator's findings.

35.     On August 8, 2012, the FDA issued the public Warning Letter to SpineFrontier President Kingsley Chin.  The letter informed Mr. Chin that an FDA inspection of SpineFrontier revealed that SpineFrontier's medical devices were adulterated, as defined by 21 U.S.C. § 351(h), in that they were not in conformity with

the current Good Manufacturing Practice ("cGMP") requirements set forth in 21 CFR

820, and that they were misbranded under 21 U.S.C. 352(t)(2) due to SpineFrontier's

failure to furnish required material or information with respect to its medical devices.

36.     In the Warning Letter, the FDA cautioned SpineFrontier that the violations

within the letter were not meant as an exhaustive list, stating that the company's

violations included but were "not limited to" the violations listed, and later that the

letter was "not intended to be an all-inclusive list" of violations at SpineFrontier's

facility.  Nonetheless, the letter addressed eight different violations of cGMP regulations

that made the company's devices "adulterated," and two violations of the Food, Drug &

Cosmetics Act that rendered the devices "misbranded."

37.     As SpineFrontier had attempted to address six of the eight "adulteration"

violations, the Warning Letter discussed SpineFrontier's responses.  With respect to one

of the responses, regarding SpineFrontier's failure to conduct design validation, the

FDA stated that it understood that remedial measures were in process, requiring

SpineFrontier to provide documentation to the FDA once that process was complete

and making no determination as to the adequacy of SpineFrontier's response.  With

respect to a second response, regarding SpineFrontier's failure to maintain data on

changes to products made by its suppliers, the FDA determined that SpineFrontier's

response was adequate.  With respect to SpineFrontier's other four responses, the FDA

determined that the responses were inadequate.  With respect to two "adulteration"

violations, SpineFrontier had not made a response.  With respect to SpineFrontier's

14

responses to the two "misbranding" violations, the FDA determined that both were

inadequate.

38.     Significantly, two of the eight types of "adulteration" violations found by

the FDA investigator and for which the FDA considered SpineFrontier's responses

inadequate were violations of 21 CFR 820.198, which had been cited to company

officials by Katz while she was still employed by SpineFrontier.  The Warning Letter

details SpineFrontier failures to track lot numbers, to report adverse events, to

investigate complaints, and to implement CAPAs once created, failures which are

highly related to its haphazard compliance with CAPA regulations and its own CAPA

procedures.  In the Warning Letter, the FDA states that despite SpineFrontier learning

of a patient death associated with one of its devices, the company never reported it to

the FDA, making the company's devices misbranded pursuant to 21 U.S.C. § 352(t)(2).

Failures to track information about its devices made it difficult for SpineFrontier to

comply with other regulatory and statutory requirements.

## THE REGULATORY AND STATUTORY SCHEME

39.     Medicaid is a joint program of the United States government and state

governments to provide medical services, including prescription devices, to persons

who could not otherwise afford them.  All of the states and the District of Columbia

participate in Medicaid and use state or district funds to pay for medical devices.

40.     The United States also pays for devices through a number of other

programs.  Medicare is a social insurance program administered by the United States

government, providing health insurance coverage to people who are aged 65 and over, who are disabled and have been receiving either Social Security benefits or the Railroad Retirement Board disability benefits for at least 24 months, who receive dialysis for end stage renal disease or need a kidney transplant, or who have amyotrophic lateral sclerosis and are eligible for Social Security Disability Insurance.

41.     In addition, the Department of Veterans Affairs, the Department of Defense's TRICARE program, and the Federal Employees Health Benefit Plan each pay for medical devices with funds provided by the United States.  Hospitals owned and operated by the Veteran's Administration and hospitals operated by the branches of the United States military directly purchase medical devices.

42.     These government programs spend billions of dollars each year on prescription drugs and devices.  Not surprisingly, in order to prevent waste, fraud and abuse, the federal programs restrict the types and uses of devices which may be paid for with government funds.  These regulatory schemes are designed to ensure that the federal and state programs only pay for devices which are found to be safe and effective for their prescribed uses.

43.     21 U.S.C. § 331(a) prohibits the introduction or delivery for introduction into interstate commerce of any device that is adulterated or misbranded.  21 U.S.C. § 331(c) prohibits the receipt of any device that is adulterated or misbranded, and the delivery or proferred delivery thereof for pay or otherwise.  Payment for expenses incurred for devices that cannot be legally sold cannot be reasonable or necessary, and

government programs are not authorized to make such payments.  42 U.S.C.

§ 1395y(a)(1)(A).

44.     21 U.S.C. § 351 addresses the conditions under which a device is deemed

adulterated, and 21 U.S.C. § 352 addresses the conditions under which a device is

deemed misbranded.  In addition to identifying specific conditions, however, both

sections, as well as other sections of the Food, Drug & Cosmetics Act, authorize and

adopt regulations promulgated by the FDA designed to adapt to cGMP.  21 U.S.C.

§§ 351, 352, 360, 360c, 360d, 360e, 360h, 360i, 360j, 360l, 371, 381, 383.

45.     The Food and Drug Administration develops and implements national

regulations relating to medical devices, as authorized by the Food Drug & Cosmetics

Act.  The regulations are intended to protect the public health by ensuring that medical

devices are safe, effective, and properly labeled.

46.     21 CFR 820 sets forth current good manufacturing practice requirements

for manufacturers of all medical devices intended for human use.  21 CFR 820.100(a)

requires device manufacturers to establish and maintain CAPAs.  21 CFR 820.100(a)(2)

requires manufacturers to implement CAPA procedures for investigating causes of

nonconformities relating to the manufacturer's product, process and quality system.  21

CFR 820.100(a)(4) requires manufacturers to implement procedures to verify or validate

CAPAs, in order to ensure that such action is effective and does not adversely affect the

finished device.

47.     21 CFR 820.198(a)(1) requires each manufacturer to establish and maintain procedures for receiving, reviewing and evaluating complaints by a formally designated unit.  These complaints must be processed in a uniform and timely manner. 21 CFR 820.198(a)(3) requires all complaints to be evaluated to determine whether the complaint represents an event which is required to be reported to the FDA.

48.     21 CFR 820.30(g) requires each manufacturer to establish and maintain procedures for validating the device design.  Design validation shall be performed under defined operating conditions on initial production units, lots, or batches.  Design validation must ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated conditions.

49.     21 CFR 820.30(f) requires manufacturers to maintain procedures for verifying the design of a device.  Design verification must confirm that the design output meets the design input requirements.  All of the results of the design verification must be documented in the device history record ("DHF").

50.     Device manufacturers must maintain purchasing data to assure that the manufacturer is aware of any changes to the products made by suppliers that could affect the quality of the finished device.  21 CFR 820.50(b).

51.     Device manufacturers must submit a written report to the FDA of any correction or removal of a device within 10 days.  21 CFR 806.10(b).  An additional reporting requirement for device manufacturers is set forth at 21 CFR 803.50(a)(1), which requires a device manufacturer to report any information that reasonably

18

suggests a device marketed by the manufacturer may have caused death or serious

injury to the FDA within 30 days of the manufacturer learning of the information.

52.     21 CFR 820.65 sets forth the traceability requirements relating to medical

devices that are surgically implanted in a patient, and whose failure to perform when

properly used can be reasonably expected to result in significant injury to the patient.

The traceability regulations require manufacturers of these medical devices to establish

and maintain procedures for identifying each unit or lot of finished medical devices

with a control number.  These identification procedures are in place to facilitate

corrective action should something go wrong with the device.  The identification

numbers ("lot numbers") are to be documented in the device history records.

53.     21 CFR 821.25 sets forth the FDA's tracking requirements for

manufacturers of three categories of implantable medical devices: 1) devices whose

failure would be reasonably likely to have serious adverse health consequences; 2)

devices intended to be implanted in the human body for more than 1 year; and 3)

devices that are life-sustaining or life-supporting and used outside of a device user

facility.  The regulations require manufacturers of medical devices that fall into one of

these three categories to adopt a method of tracking that allows the manufacturer to

provide the FDA with a variety of information for each tracked device, including

contact information for the distributor of the medical device and the location of the

device, the lot number of each device, the date the device was shipped by the

manufacturer, contact information for the patient receiving the device, the date the

device was provided to the patient and the contact information for the physician

following the patient who received the device.  21 CFR 821.25 also requires a

manufacturer of a tracked device to keep records of this information and to establish a

standard operating procedure for collecting, maintaining, and auditing this

information.

54.     The tracking and tracing regulations both require the lot numbers of

medical devices to be recorded by the manufacturer.  This requirement protects the

public health by allowing the FDA to quickly identify defective devices and take swift

corrective action to treat each patient affected by a defective device.

## THE FDA'S DETERMINATIONS THAT SPINEFRONTIER'S DEVICES WERE ADULTERATED AND MISBRANDED

55.     After the FDA investigated SpineFrontier and provided the company with

a chance to respond to its investigator's observations, the agency made a series of

determinations about SpineFrontier's compliance with cGMP, 21 CFR 800-1299, and the

Food, Drug and Cosmetics Act.  With a public Warning Letter on August 8, 2012, the

FDA determined that SpineFrontier had had an adequate response to one type of

violation, but that nine other types of violations made the company's devices either

"adulterated" or "misbranded," any one of which would prohibit the devices' sale.

56.     Several of the violations found by the FDA concerned SpineFrontier's

failure to follow procedures concerning the company's information gathering

procedures, its handling of adverse events and CAPAs, and its failures to take remedial

actions or report as required to the FDA.  Specifically, the Warning Letter stated that the

FDA had conducted an inspection of SpineFrontier and had observed that CAPAs were not being opened as required by SpineFrontier's own procedure, in violation of 21 CFR 820.100(a). The Warning Letter also stated that CAPAs relating to investigations of device nonconformities were not being evaluated within 30 days as required by 21 CFR 820.100(a)(2). SpineFrontier was also in violation of 21 CFR 820.100(a)(4), for failing to demonstrate that corrective and preventive actions were taken to address the impact knob of the SLIF Inserter, Locking shaft breaking off during surgery. The Warning Letter documented SpineFrontier's violation of 21 CFR 820.198(a)(1) for not adequately maintaining and documenting complaints prior to January 2012. The FDA also found that SpineFrontier had not performed a timely review of complaints it received from September 21, 2011 through March 9, 2012, as required by 21 CFR 820.198(a)(3). For these violations, the FDA took issue not only with SpineFrontier's timeliness with respect to these violations, but also with the company's information-gathering and investigation efforts that would have facilitated accurate and complete corrective actions and FDA reporting.

57.     In the Warning Letter, the FDA further determined that SpineFrontier's devices were adulterated for failures to institute and observe procedures that would safeguard the devices' safety before they ever left the company's facility. SpineFrontier had violated 21 CFR 820.30(g) by failing to perform any validation to demonstrate that the cases or caddies used to hold SpineFrontier's medical devices could withstand multiple cleaning and sterilization cycles – a shortcoming all the more important

because the company had noted "numerous reports" of flaking on the cases and

caddies.  The Warning Letter also cited several examples of SpineFrontier's failure to

verify its device design by confirming that design outputs met design input

requirements as required by 21 CFR 820.30(f), a procedural requirement that could

prevent the implantation of devices that differed from the design approved by the FDA.

58.     The FDA's inspection of SpineFrontier also revealed that its devices were

misbranded under 21 U.S.C. 352(t)(2), due to SpineFrontier's failure to furnish required

material or information with respect to its medical devices.  One set of information not

furnished was notification of device correction and removal actions within 10 days as

required by 21 CFR 806.10(b).  For example, on December 23, 2011, SpineFrontier issued

a voluntary recall due to two possible breakages that could occur with the device, but

failed to make a timely report as required by 21 CFR 806.10(b).  This was not an isolated

incident, as the FDA determined.  On May 14, 2012, SpineFrontier issued a voluntary

recall for three lots of a device due to breakage, and again failed to make a timely report

as required by law.

59.     Finally, the FDA determined that SpineFrontier's devices were

misbranded for a completely distinct reason: failure to notify the FDA within 30 days

after becoming aware of information from any source that reasonably suggested that

one of the devices it sold may have caused or contributed to a person's death or serious

injury, as required by 21 CFR 803.50(a)(1).  The FDA determined that on at least two

occasions, when SpineFrontier had been made aware of a person's death or serious

injury due to a malfunction of one of its devices, it failed to make a timely report to the

FDA.  In another instance, the least recent cited by the FDA and yet less than one year

prior, SpineFrontier had become aware of a patient death associated with a device and

never reported it at all.

## FIRST CAUSE OF ACTION
## VIOLATION OF 31 U.S.C. § 3730(h)

60.     The Plaintiff repeats and realleges each of the allegations set forth in the

preceding paragraphs as though set forth herein.

61.     The Plaintiff was engaged in conduct protected by the anti-retaliation

provision of the federal False Claims Act, 31 U.S.C. § 3730(h)(1), because she was a

SpineFrontier employee, and because of her efforts to stop SpineFrontier practices that

made the SpineFrontier devices adulterated and misbranded.  Because SpineFrontier

was prohibited from selling devices in that condition to any party, and because federal

health care programs are not authorized to pay for devices that cannot be legally sold,

the Plaintiff's efforts to stop SpineFrontier's manufacture and sale of adulterated and

misbranded devices were efforts to stop violations of the False Claims Act, 31 U.S.C. §

3729(a)(1)(A)-(C).

62.     SpineFrontier was aware that the Plaintiff was engaged in protected

activity because the protected activity itself involved making SpineFrontier officers

aware of it.  The Plaintiff made efforts to stop SpineFrontier's lot tracking conduct by

voicing concerns to several SpineFrontier officials, including CFO Aditya Humad, her

immediate supervisor, in early 2011.  She did so again by opening a Corrective and

Preventative Action in February 2012 that CIO Christopher Chang personally closed. She did so again by forwarding support for her concerns from an FDA agent to Humad and Chang, as well as to Alyce Nelson, the SpineFrontier Director of Quality Assurance and Regulatory Compliance Department, who confirmed receipt of that information on the Plaintiff's final day in the office before the day she was terminated.

63.     SpineFrontier retaliated against the Plaintiff because of her protected conduct, which right before her termination had demonstrated to SpineFrontier that the Plaintiff was certain of her concerns, that she was willing to go outside the company to address them, and that she was willing to persist in her efforts to stop violative SpineFrontier practices despite the admonitions of company officers to let it go.

64.     SpineFrontier's retaliatory conduct, prohibited by 31 U.S.C. § 3730(h)(1), included her termination.  As a result of SpineFrontier's wrongful retaliatory conduct, the Plaintiff has suffered substantial financial losses, lost valuable restricted stock units, and suffered substantial emotional distress.

WHEREFORE, the Plaintiff, on her behalf and pursuant to 31 U.S.C. § 3730(h)(2), requests that this Court:

(a) Reinstate the Plaintiff with the same seniority status that she would have had but for the wrongful retaliation;

(b) Award the Plaintiff two times the amount of back pay she would have earned but for the retaliation, and interest on that award;

24

(c)   Award the Plaintiff compensation for all special damages she has

sustained as a result of SpineFrontier's retaliation, including but not

limited to the value of restricted stock units and her costs and

reasonable attorneys' fees for prosecuting this action; and

(d) Enter such other relief which the Court finds just and equitable.

## SECOND CAUSE OF ACTION
## VIOLATION OF 12 M.G.L. § 5J(2)

65.    The Plaintiff repeats and realleges each of the allegations set forth in the

preceding paragraphs as though set forth herein.

66.    The Plaintiff was engaged in conduct protected by the anti-retaliation

provision of the Massachusetts False Claims Act, 12 M.G.L. § 5J(2), because she was a

SpineFrontier employee, and because of her efforts to stop SpineFrontier practices that

made the SpineFrontier devices adulterated and misbranded.  Because SpineFrontier

was prohibited from selling devices in that condition to any party, and because

Medicaid is not authorized to pay for devices that cannot be legally sold, the Plaintiff's

efforts to stop SpineFrontier's manufacture and sale of adulterated and misbranded

devices were efforts to stop violations of the Massachusetts False Claims Act, 12 M.G.L.

§ 5B(a)(1)-(3).

67.    SpineFrontier was aware that the Plaintiff was engaged in protected

activity because the protected activity itself involved making SpineFrontier officers

aware of it.  The Plaintiff made efforts to stop SpineFrontier's lot tracking conduct by

voicing concerns to several SpineFrontier officials, including CFO Aditya Humad, her immediate supervisor, in early 2011.  She did so again by opening a Corrective and Preventative Action in February 2012 that CIO Christopher Chang personally closed. She did so again by forwarding support for her concerns from an FDA agent to Humad and Chang, as well as to Alyce Nelson, the SpineFrontier Director of Quality Assurance and Regulatory Compliance Department, who confirmed receipt of that information on the Plaintiff's final day in the office before the day she was terminated.

68.     SpineFrontier retaliated against the Plaintiff because of her protected conduct, which right before her termination had demonstrated to SpineFrontier that the Plaintiff was certain of her concerns, that she was willing to go outside the company to address them, and that she was willing to persist in her efforts to stop violative SpineFrontier practices despite the admonitions of company officers to let it go.

69.     SpineFrontier's retaliatory conduct, prohibited by 12 M.G.L. § 5J(2), included her termination.  As a result of SpineFrontier's wrongful retaliatory conduct, the Plaintiff has suffered substantial financial losses, lost valuable restricted stock units, and suffered substantial emotional distress.

WHEREFORE, the Plaintiff, on her behalf and pursuant to 12 M.G.L. § 5J(3), requests that this Court:

> (a) Reinstate the Plaintiff with the same seniority status that she would
>     have had but for the wrongful retaliation;

(b) Award the Plaintiff two times the amount of back pay she would have earned but for the retaliation, and interest on that award;

(c) Award the Plaintiff compensation for all special damages she has sustained as a result of SpineFrontier's retaliation, including but not limited to the value of restricted stock units;

(d) Award her costs and reasonable attorneys' fees for prosecuting this action; and

(e) Enter such other relief which the Court finds just and equitable.

## THIRD CAUSE OF ACTION
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

70.     The Plaintiff repeats and realleges each of the allegations set forth in the preceding paragraphs as though set forth herein.

71.     Under the common law, Massachusetts employees have a right to act in good faith to halt harm to the public, to try to prevent conduct that the employee believes will endanger the public, and to refuse to participate in such conduct or to report it to appropriate authorities, including the FDA.  Any type of disciplinary action or termination which is taken in retaliation for such protected conduct is against public policy and constitutes wrongful retaliation or termination.

72.     The Plaintiff was retaliated against for conduct protected under the common law in Massachusetts.  Conduct which makes medical devices adulterated or misbranded and the introduction of adulterated or misbranded medical devices into

27

interstate commerce may cause serious personal injury, and constitute criminal violations of federal law.  The Plaintiff was retaliated against for trying to prevent the adulteration or misbranding of SpineFrontier medical devices and from their continued sale in an adulterated or misbranded condition, conduct which the Plaintiff believed would endanger the public.

73.     It was the Commonwealth of Massachusetts which provided the grant money for the Plaintiff to be trained on compliance with current good manufacturing practices on behalf of SpineFrontier – and it was that training which trained the Plaintiff on the necessity and manner of opening the Corrective and Preventative Action shortly before her termination.  The Commonwealth has a substantial, public policy interest in the compliance of medical device manufacturers with federal statutes and regulations designed to ensure their safety.

74.     SpineFrontier's termination of the Plaintiff was in violation of public policy and constitutes a wrongful termination.  As a result of the wrongful termination, the Plaintiff has suffered substantial financial losses, lost valuable restricted stock units, and suffered substantial emotional distress.

WHEREFORE, the Plaintiff, on her behalf, requests that this Court:

(a) Reinstate the Plaintiff with the same seniority status that she would have had but for the wrongful retaliation;

(b) Award the Plaintiff the amount of back pay she would have earned but for the retaliation, and interest on that award;

(c) Award the Plaintiff compensation for all special damages she has sustained as a result of SpineFrontier's termination in violation of public policy, including but not limited to the value of restricted stock units;

(d) Award her costs and reasonable attorneys' fees for prosecuting this action; and

(e) Enter such other relief which the Court finds just and equitable.

PATRICIA KATZ

By her attorneys,

Dated: April 28, 2015                              /s/ Thomas M. Greene

Thomas M. Greene (BBO# 210020)
tgreene@greenellp.com
Michael Tabb (BBO# 491310)
matabb@greenellp.com
Ryan P. Morrison (BBO# 680238)
rmorrison@greenellp.com
Tucker D. Greene (BBO# 682943)
tucker.greene@greenellp.com
GREENELLP
One Liberty Square, Suite 1200
Boston, MA 02109
(617) 261-0040